## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| MR LICENSING LLC, | § § § | Case No. 2:25-cv- |
| Plaintiff, | § § | **JURY TRIAL DEMANDED** |
| v. | § § § | |
| SEAGATE TECHNOLOGY HOLDINGS PLC, SEAGATE SINGAPORE INTERNATIONAL HEADQUARTERS PTE. LTD, SEAGATE TECHNOLOGY INTERNATIONAL, SEAGATE TECHNOLOGY (THAILAND) LIMITED, and SEAGATE TECHNOLOGY (NETHERLANDS) BV, | § § § § § § § § § § § | |
| Defendants. | § § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff MR Licensing LLC ("MRL" or "Plaintiff"), files this Complaint against Defendants Seagate Technology Holdings plc ("Seagate plc"), Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore"), Seagate Technology International ("Seagate International"), Seagate Technology (Thailand) Limited ("Seagate Thailand"), Seagate Technology (Netherlands) BV ("Seagate Netherlands"), (collectively, "Seagate," or "Defendants"), for patent infringement under 35 U.S.C. § 271 and alleges as follows:

## THE PARTIES

1.    Plaintiff MRL is a limited liability company, organized and existing under the laws of the State of Texas, with its principal place of business located at 313 South Washington Avenue, Marshall, Texas 75670. MRL is the owner of all rights, title, and interest in and to U.S. Patent Nos. 10,204,041 (the "'041 Patent"), 7,979,658 (the "'658 Patent"), 8,239,611 (the "'611 Patent"),

8,694,776 (the "'776 Patent"), 9,734,049 (the "'049 Patent"), 9,767,303 (the "'303 Patent"), 11,093,383 (the "'383 Patent"), and 11,609,847 Patent (the "'847 Patent") (collectively, the "Asserted Patents").

2.      The technology underlying the Asserted Patents was developed by Spansion LLC ("Spansion").  Spansion, a world-leading designer, developer, and manufacturer of memory products, had over 3,700 employees and operated a wafer fabrication facility in Austin, Texas. Spansion merged with Cypress Semiconductor ("Cypress") in 2014, and the combined company operated under the Cypress name.  Cypress was acquired by Infineon Technologies in 2020 for approximately $10 billion.

3.      Upon information and belief, Defendant Seagate plc is an Irish corporation, organized and existing under the laws of Ireland, with its place of business located at 10 Earlsfort Terrace, Dublin, D02 T380 Ireland, and may be served pursuant to the provisions of the Hague Convention. On information and belief, Seagate plc also has a place of business located at Springtown Industrial Estate, Londonderry BT48 0BF, United Kingdom.

4.      Upon information and belief, Defendant Seagate Singapore is a Singaporean corporation, organized and existing under the laws of Singapore, with its place of business located at 90 Woodlands Avenue 7, Singapore 737911, Singapore, and may be served pursuant to the provisions of the Hague Convention.

5.      Upon information and belief, Defendant Seagate International is a Cayman Islands corporation, organized and existing under the laws of the Cayman Islands, with its place of business located at P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands, and may be served pursuant to the provisions of the Hague Convention.

6.      Upon information and belief, Defendant Seagate Thailand is a Thai corporation, organized and existing under the laws of Thailand, with its place of business located at 1627 Moo 7 Teparuk Road, Tambol Teparuk, Amphur Muang, Samutprakarn 10270, Thailand, and may be served pursuant to the provisions of the Hague Convention.

7.      Upon information and belief, Defendant Seagate Netherlands is a Dutch corporation, organized and existing under the laws of the Netherlands, with its place of business located at Tupolevlaan 105, 1119 PA Schiphol-Rijk, The Netherlands, and may be served pursuant to the provisions of the Hague Convention.

## JURISDICTION AND VENUE

8.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      This his Court has specific and personal jurisdiction over the Defendants consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Upon information and belief, the Defendants have sufficient minimum contacts with the forum because Defendants transact substantial business in the State of Texas and in this Judicial District. Further, the Defendants have, directly or through subsidiaries or intermediaries, committed and continue to commit acts of patent infringement in the State of Texas, and place their products and/or services, including those accused herein of infringement, into the stream of commerce which terminate in the Judicial District of the Eastern District of Texas, as alleged more particularly below. For example, upon information and belief, the Accused Products are available for purchase in this Judicial District.

10.      For example, Defendants directly place their products into the stream of commerce

in the Eastern District of Texas by allowing customers to purchase the products from their website.



11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because the Defendants are foreign companies that may be sued in any Judicial District, including the Eastern District of Texas. The Defendants are subject to personal jurisdiction in this Judicial District and have committed acts of patent infringement in this Judicial District. On information and belief, the Defendants through their own acts and/or through the acts of each other, make, use, sell, and/or offer to sell infringing products within this Judicial District, regularly do and solicit business in this Judicial District, and have the requisite minimum contacts with the Judicial District, such that this venue is a fair and reasonable one.

## PATENTS-IN-SUIT AND FACTUAL BACKGROUND

12.     On February 12, 2019, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,204,041 (the "'041 Patent"), entitled "Relocating Data in a Memory Device." A true and correct copy of the '041 Patent is available here https://patentimages.storage.googleapis.com/03/33/b6/d8f6d89e93a610/US10204041.pdf.

13.     On July 12, 2011, the United States Patent and Trademark Office duly and legally

---

[1] https://www.seagate.com/products/

issued U.S. Patent No. 7,979,658 (the "'658 Patent"), entitled "Secure Management of Memory Regions in a Memory." A true and correct copy of the '658 Patent is available here https://patentimages.storage.googleapis.com/13/b7/17/bdbb3c9fff3055/US7979658.pdf.

14.    On August 7, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,239,611 (the "'611 Patent"), entitled "Relocating Data in a Memory Device." A true and correct copy of the '611 Patent is available here https://patentimages.storage.googleapis.com/29/39/2a/a2a132867799f2/US8239611.pdf.

15.    On April 8, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,694,776 (the "'776 Patent"), entitled "Authenticated Memory and Controller Slave." A true and correct copy of the '776 Patent is available here https://patentimages.storage.googleapis.com/e1/90/ac/04a9aee1bd0bd8/US8694776.pdf.

16.    On August 15, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,734,049 (the "'049 Patent"), entitled "Relocating Data in a Memory Device." A true and correct copy of the '049 Patent is available here https://patentimages.storage.googleapis.com/47/c6/11/14ab51848a3e60/US9734049.pdf.

17.    On September 19, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,767,303 (the "'303 Patent"), entitled "Authenticated Memory and Controller Slave." A true and correct copy of the '303 Patent is available here https://patentimages.storage.googleapis.com/d2/2a/1d/d58b1ff854191e/US9767303.pdf.

18.    On August 17, 2021, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,093,383 (the "'383 Patent"), entitled "Relocating Data in a Memory Device." A true and correct copy of the '383 Patent is available here https://patentimages.storage.googleapis.com/84/9b/1f/6c686287ad33db/US11093383.pdf.

19.     On March 21, 2023, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,609,847 (the "'847 Patent"), entitled "Relocating Data in a Memory Device." A true and correct copy of the '847 Patent is available here https://patentimages.storage.googleapis.com/1c/c9/a7/06bd8ee34961d1/US11609847.pdf

20.     MRL is the sole and exclusive owner of all right, title, and interest in the '041 Patent, the '658 Patent, the '611 Patent, the '776 Patent, the '049 Patent, the '303 Patent, the '383 Patent, and the '847 Patent (collectively "Patents-in-Suit"), and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. MRL also has the right to recover all damages for past, present, and future infringement of the Patents-in-Suit and to seek injunctive relief as appropriate under the law.

21.     MRL has at all times complied with the marking provision of 35 U.S.C. § 287 with respect to the Patents-in-Suit.

22.     Defendants have infringed and continue to infringe one or more of the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import the Accused Products. The Accused Products include, but are not limited to, all Seagate products, including brands or companies owned by Seagate, containing self-encrypting memory components; all Seagate products, including brands or companies owned by Seagate, that facilitate a wipe erase of a memory region when received authentication data matches authentication data associated with the memory region; all Seagate, including brands or companies owned by Seagate, products that include two independent processor components, one configured to perform a lower level memory operation and the other configured to perform a higher level memory operation; all Seagate, including brands or companies owned by Seagate, Self-Encrypting Drives; all Seagate, including brands or companies owned by Seagate,

products supporting DDR3(L) or DDR4 SDRAM; and all Seagate, including brands or companies owned by Seagate, products supporting NVMe. This includes, but is not limited to, Seagate BarraCuda products, Seagate FireCuda products, Seagate Nytro products, and Seagate Exos products. Defendants have received prior notice about the Patents-in-Suit and their infringement of the Patents-in-Suit, and/or have remained willfully blind to the Patents-in-Suit.

## PRE-SUIT KNOWLEDGE AND WILLFULNESS

23.     Paragraphs 1 through 22 are incorporated by reference as if fully set forth herein.

24.     Before filing this action, Defendants were notified about the Asserted Patents and their infringement thereof. The prior assignee of the patents, Monterey Research ("Monterey") identified the Asserted Patents to Seagate in multiple communications from 2020-2021. Seagate was alleged to infringe the Asserted Patents, including identifying exemplary infringing products, Monterey sought to engage Seagate in discussions regarding its use of Monterey's intellectual property.

25.     On July 27, 2020, Monterey sent a letter to Seagate notifying Seagate of its infringement of the '303 Patent, the '658 Patent, and the '776 Patent. In the letter, Monterey identified many exemplary infringing products, including the BarraCuda 510, and identified all Seagate products containing self-encrypting memory components as infringing the '776 Patent and the '303 Patent. Monterey further identified many exemplary products, including the Exos X X10/X12, and identified all Seagate products that facilitate a wipe erase of a memory region when received authentication data matches authentication data associated with the memory region as infringing the '658 Patent. In this letter, Monterey discussed the possibility of licensing the technology to Seagate and urged Seagate to reach out to Longitude Licensing Limited to handle the licensing discussion.

26.     On October 8, 2020, Monterey sent a follow-up letter to Seagate regarding its initial July 27, 2020 letter.

27.     On October 15, 2020, Seagate replied that it was not interested in licensing the patents mentioned in the initial July 27, 2020 correspondence.

28.     On October 26, 2020, Longitude Licensing Limited sent a follow up letter asking for a meeting with Seagate, as to further demonstrate Seagate's infringement of the patents mentioned in the July 27, 2020 Letter.

29.     On January 22, 2021, Monterey sent another letter to Seagate notifying Seagate of its infringement of the '611 Patent, the '049 Patent, and the '041 Patent. Monterey identified many exemplary products, including the BaraCuda 510, and identified all Seagate products that included two independent processor components, one configured to perform a lower level memory operation and the other configured to perform a higher level memory operation as infringing the '611 Patent, the '049 Patent, and '041 Patent. Again, MRL attempted to engage in licensing discussions about these patents with Seagate.

30.     Despite Monterey's repeated effort, Seagate has not engaged in meaningful discussions to license the Asserted Patents, and Seagate has also not taken steps to end its infringement of the Asserted Patents. Instead, Seagate continues to knowingly, intentionally, and willfully infringe MRL's patents directly, contributorily, and by inducement, to obtain their significant benefits without a license from MRL.

## COUNT I
### (Infringement of the '041 Patent)

31.     Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

32.     MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '041 Patent.

33.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the '041 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '041 Patent including, but not limited to, at least the Accused Products.

34.     Defendants have and continue to directly infringe the '041 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '041 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '041 Patent.

35.     For example, Defendants have and continue to directly infringe at least claim 1 of the '041 Patent by making, using, offering to sell, selling, and/or importing into the United States products that practice a method for relocating data stored in a device comprising: first performing, using a memory controller module within a memory component, the at least one lower level memory operation on the memory component, wherein the memory component comprises a plurality of memory locations, the plurality of memory locations comprising at least one memory location and at least one different memory location, wherein the at least one lower level memory operation comprises performing, on the at least one memory location, the at least one of a read, a write, an erase, or a refresh operation, and wherein the memory controller module performs the at least one lower level memory operation on a first bus; determining, using a memory manager module within the memory component, the memory manager module being independent of the memory controller module, to relocate data in the at least one memory location to the at least one different memory location based at least in part on a predetermined relocation criterion; and second performing, using the memory manager module and based at least in part on the determining, the

second performing comprising at least one higher level memory operation on the memory component, the at least one higher level memory operation comprising moving the data from the at least one memory location to the at least one different memory location, wherein the at least one different memory location is determined to be less worn than the at least one memory location, wherein the first performing is performed at least partially concurrently with, but independently from, the determining, wherein the first performing utilizes the memory controller module without utilizing the memory manager module, and the memory manager module performs the higher level memory operation on the first bus.

36.    The Accused Products practice a method for relocating data stored in a device. For example, the FireCuda 530 practices a method for relocating data stored in a device.

37.    The Accused Products practice a method for first performing, using a memory controller module within a memory component, and at least one lower level memory operation on the memory component. For example, the FireCuda 530 has NAND Flash memory. For example, the FireCuda 530 has a controller (Phison PS5018-E18) that is configured to perform read/write operations.



Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| Controller | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| NAND Flash | 176L 3D TLC NAND (Micron B47R) | | | |
| Form-Factor, Interface | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| Sequential Read | 7000 MB/s | 7300 MB/s | | |
| Sequential Write | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| Random Read IOPS | 400K | 800K | 1M | |
| Random Write IOPS | 700K | 1M | | |
| Pseudo-SLC Caching | Supported | | | |
| TCG Opal Encryption | No | | | |
| Warranty | 5 years (with 3 year DRS) | | | |
| Write Endurance | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| MSRP (non-heatsink) | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21

38.     The Accused Products practice a method wherein the memory component comprises a plurality of memory locations, the plurality of memory locations comprising at least one memory location and at least one different memory location. For example, upon information and belief, the FireCuda 530 has numerous memory locations

39.     The Accused Products practice a method wherein the at least one lower level memory operation comprises performing, on the at least one memory location, the at least one of a read, a write, an erase, or a refresh operation. For example, the FireCuda 530 is configured to perform read/write operations.

40.     The Accused Products practice a method wherein the memory controller module

performs the at least one lower level memory operation on a first bus. For example, upon information and belief, the FireCuda 530 is configured to perform the read/write operations on the first bus.

41.    The Accused Products practice a method for determining, using a memory manager module within the memory component, the memory manager module being independent of the memory controller module, to relocate data in the at least one memory location to the at least one different memory location based at least in part on a predetermined relocation criterion. For example, upon information and belief, the FireCuda 530 has a memory manager, independent of the controller, which can determine if relocating data in one memory location to another is appropriate. For example, the FireCuda 530 is configured to perform wear leveling.

**7.1.2    Wear Leveling**

NAND flash devices can only undergo a limited number of program/erase cycles, and in most cases, the flash media are not used evenly. If some areas get updated more frequently than others, the lifetime of the device would be reduced significantly. Thus, Wear Leveling is applied to extend the lifespan of NAND Flash by evenly distributing write and erase cycles across the media.

Seagate provides advanced Wear Leveling algorithm, which can efficiently spread out the flash usage through the whole flash media area. Moreover, by implementing both dynamic and static Wear Leveling algorithms, the life expectancy of the NAND flash is greatly improved.

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

42.    Accused Products practice a method for second performing, using the memory manager module and based at least in part on the determining, the second performing comprising at least one higher level memory operation on the memory component, the at least one higher level memory operation comprising moving the data from the at least one memory location to the at least one different memory location. For example, the FireCuda 530 is configured to perform wear leveling, i.e., moving memory to a less worn page or block.

### 7.1.2    Wear Leveling

NAND flash devices can only undergo a limited number of program/erase cycles, and in most cases, the flash media are not used evenly. If some areas get updated more frequently than others, the lifetime of the device would be reduced significantly. Thus, Wear Leveling is applied to extend the lifespan of NAND Flash by evenly distributing write and erase cycles across the media.

Seagate provides advanced Wear Leveling algorithm, which can efficiently spread out the flash usage through the whole flash media area. Moreover, by implementing both dynamic and static Wear Leveling algorithms, the life expectancy of the NAND flash is greatly improved.

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

43.    The Accused Products practice a method wherein the at least one different memory location is determined to be less worn than the at least one memory location. For example, upon information and belief, the FireCuda 530 must do this to perform wear leveling

44.    The Accused Products practice a method wherein the first performing is performed at least partially concurrently with, but independently from, the determining. For example, upon information and belief, the FireCuda 530 is configured to perform the read/write operations, at least partially concurrently, but independently from the determining of less worn memory locations.

45.    The Accused Products practice a method wherein the first performing utilizes the memory controller module without utilizing the memory manager module. For example, upon information and belief, the FireCuda 530 is configured to perform the read/write operations without utilizing the memory manager.

46.    The Accused Products practice a method wherein the memory manager module performs the higher level memory operation on the first bus. For example, upon information and belief, the FireCuda 530 is configured to perform the wear leveling operation on the first bus.

47.    Defendants have and continue to indirectly infringe one or more claims of the '041 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such

as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '041 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '041 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '041 Patent. Defendants perform these affirmative acts with knowledge of the '041 Patent and with intent, or willful blindness, that they cause the direct infringement of the '041 Patent.

48.     Defendants had actual notice they were infringing the '041 Patent as of January 22, 2021.

49.     Defendants are, and have been, on actual notice of the '041 Patent and they knowingly, willfully, and deliberately continue to infringe the '041 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

50.     MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '041 Patent in an amount to be proved at trial.

51.     MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '041 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## COUNT II
### (Infringement of the '658 Patent)

52.     Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

53.     MRL has not licensed or otherwise authorized Defendants to make, use, offer for

sale, sell, or import any products that embody the inventions of the '658 Patent.

54.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the '658 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '658 Patent including, but not limited to, at least the Accused Products.

55.    Defendants have and continue to directly infringe the '658 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '658 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '658 Patent.

56.    For example, Defendants have and continue to directly infringe at least claim 1 of the '658 Patent by making, using, offering to sell, selling, and/or importing into the United States products that comprise a system that facilitates control of access to at least one memory, comprising: the at least one memory that contains a plurality of memory regions to facilitate storage of data; and an access management component that facilitates control of access to the plurality memory regions based in part on a predetermined access criteria, the access management component: compares received authentication data and compares the received authentication data to authentication data associated with a memory region and makes a determination regarding whether the received authentication data matches the authentication data associated with the memory region; facilitates a wipe erase of a memory region when the received authentication data matches the authentication data associated with the memory region; and facilitates creation of a new security record that contains a default authentication credential.

57.    The Accused Products comprise a system that facilitates control of access to at least

one memory. For example, the Seagate Exos X Series are Self-Encrypting Hard drives (SED).



## Protect your Data with Seagate Secure Self-Encrypting Drives

Seagate Self-Encrypting Drive (SED) hard drives are validated as FIPS 140-2 Level 2 conformant for sensitive but unclassified data.

Source: https://www.seagate.com/blog/protect-data-with-seagate-secure-self-encrypting-drives-master-ti/



Choose the right family of Seagate Secure™ SED Drives for you.

• Exos X Series Hard Drives

*Id.*

58.     The Accused Products comprise the at least one memory that contains a plurality of memory regions to facilitate storage of data. For example, the Seagate Exos X Series contains, on the low end, 10TB of memory. For example, upon information and belief, the Seagate Exos X Series contains a plurality of memory regions to facilitate data storage.

16



Source: https://www.seagate.com/products/enterprise-drives/exos-x/

59.     The Accused Products comprise an access management component that facilitates control of access to the plurality memory regions based in part on a predetermined access criteria, the access management component. For example, the Seagate Exos X Series has a "Locking SP," which "controls read/write access." For example, the Seagate Exos X Series may "define up to 16 data bands on the drive, each data band has its own password."



Source: https://www.seagate.com/content/dam/seagate/assets/support/internal-hard-drive/enterprise-hard-drives/exos-x24/_shared/files/Seagate_EXOS24_CMR_ISE_SED(10-12-16-20-24TB)_Rev-C.pdf

60.    The Accused Products comprise an access management component that compares received authentication data and compares the received authentication data to authentication data associated with a memory region and makes a determination regarding whether the received authentication data matches the authentication data associated with the memory region. For example, the Seagate Exos X Series Locking SP has access gated by "BandMasterX or EraseMaster passwords."

61.    The Accused Products comprise an access management component that facilitates a wipe erase of a memory region when the received authentication data matches the authentication data associated with the memory region. For example, the Seagate Exos X Series Locking SP may utilize the "cryptographic erase feature" upon authentication. For example, "the host needs to use EraseMaster in order to perform a cryptographic erase."

| 4.2.2 | **Locking SP** |
|---|---|
| | The Locking SP controls read/write access to the media and the cryptographic erase feature. Access to the Locking SP is available using the BandMasterX or EraseMaster passwords. Since the drive owner can define up to 16 data bands on the drive, each data band has its own password called BandMasterX where X is the number of the data band (0 through 15). |

Source: https://www.seagate.com/content/dam/seagate/assets/support/internal-hard-drive/enterprise-hard-drives/exos-x24/_shared/files/Seagate_EXOS24_CMR_ISE_SED(10-12-16-20-24TB)_Rev-C.pdf

**2.7    EraseMaster**

The host needs to use EraseMaster in order to perform a cryptographic erase on a data band. Although there may be multiple data bands, the same EraseMaster password is used for each of them, but they must be erased one at a time by specifying the band number with the erasure request. Cryptographic erasure of a band causes the following actions to take place:

1.    A new data encryption key is created for the band in question (cryptographic erase)

2.    The band is unlocked for reading and writing. After a cryptographic erase, any data read from the media would be decrypted with the new key. This means that a Read to an LBA which has not been written with the new key will result in gibberish being returned to the host.

3.    The BandMaster password reverts to the value of MSID

Source:
https://www.seagate.com/files/staticfiles/support/docs/manual/Interface%20manuals/100515636c.pdf

62.    The Accused Products comprise an access management component that facilitates

18

creation of a new security record that contains a default authentication credential. For example, upon information and belief, on the Seagate Exos X Series when a "cryptographic erase on a data band" is performed, "[t]he BandMaster password reverts to the value of the MSID," where the MSID is the default password.

**2.4    MSID (Manufacturer's Secure ID)**

This password is assigned by Seagate during the manufacturing process and is a password that cannot be changed by the host system. When the drive is shipped from Manufacturing, all the other passwords namely SID, BandMaster and EraseMaster are set to the value of MSID which can be obtained electronically from the drive across the interface.

When the drive is delivered, the new owner should personalize the drive by defining new passwords for SID, Band-Master and EraseMaster. Failure to do so means that anyone can use the MSID to preempt the owner and take control of the drive. Such an attack on the drive is known as Denial of Service (DoS) since the rightful owner has been locked out.

**2.7    EraseMaster**

The host needs to use EraseMaster in order to perform a cryptographic erase on a data band. Although there may be multiple data bands, the same EraseMaster password is used for each of them, but they must be erased one at a time by specifying the band number with the erasure request. Cryptographic erasure of a band causes the following actions to take place:

1. A new data encryption key is created for the band in question (cryptographic erase)
2. The band is unlocked for reading and writing. After a cryptographic erase, any data read from the media would be decrypted with the new key. This means that a Read to an LBA which has not been written with the new key will result in gibberish being returned to the host.
3. The BandMaster password reverts to the value of MSID

Source:
https://www.seagate.com/files/staticfiles/support/docs/manual/Interface%20manuals/100515636 c.pdf

63.    Defendants have and continue to indirectly infringe one or more claims of the '658 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling,

distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and they directly infringe the '658 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '658 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '658 Patent.

64.    Defendants have and continue to indirectly infringe one or more claims of the '658 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '658 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '658 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '658 Patent. Defendants perform these affirmative acts with knowledge of the '658 Patent and with intent, or willful blindness, that they cause the direct infringement of the '658 Patent.

65.    Defendants had actual notice of infringement of the '658 Patent as of July 27, 2020.

66.     Defendants are, and have been, on actual notice of the '658 Patent and they knowingly, willfully, and deliberately continue to infringe the '658 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

67.     MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '658 Patent in an amount to be proved at trial.

68.     MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '658 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## COUNT III
### (Infringement of the '611 Patent)

69.     Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

70.     MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '611 Patent.

71.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the '611 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '611 Patent including, but not limited to, at least the Accused Products.

72.     Defendants have and continue to directly infringe the '611 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '611 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '611 Patent.

73.     For example, Defendants have and continue to directly infringe at least claim 1 of the '611 Patent by making, using, offering to sell, selling, and/or importing into the United States

products that comprise a system, comprising: at least one memory component configured to include a plurality of memory locations contained in a memory array, the plurality of memory locations comprising at least one memory location and at least one other memory location; a first processor component configured to perform at least one lower level memory operation on the at least one memory location, the at least one lower level memory operation comprising at least one of a read operation, a write operation, an erase operation, or a refresh operation; and a second processor component configured to be local to the at least one memory component and further configured to determine whether at least one higher level memory operation is to be performed on the at least one other memory location and, in response to determining the at least one higher level memory operation is to be performed, perform the at least one higher level memory operation on the at least one other memory location independent of the first processor component and without using any processing resources from the first processor component, the at least one higher level memory operation comprising at least one of data compaction, error code correction, or wear leveling, wherein the first processor component and the second processor component are further respectively configured to operate independent of each other for at least a portion of time including during respective performance of the at least one lower level memory operation and the at least one higher level memory operation, which are performed simultaneously, and wherein the second processor component is further configured to obtain code relating to the at least one higher level memory operation from a storage component and execute the code to facilitate performance of the at least one higher level memory operation.

74.     The Accused Products comprise at least one memory component configured to include a plurality of memory locations contained in a memory array, the plurality of memory locations comprising at least one memory location and at least one other memory location. For

example, the FireCuda 530 has, at the least, NAND flash memory. For example, upon information and belief, the memory component is configured as a flash memory array to include a plurality of memory locations, such as pages and blocks, where one memory location corresponds to a page or block, and one other memory location corresponds to another page or block.



Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| Controller | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| NAND Flash | 176L 3D TLC NAND (Micron B47R) | | | |
| Form-Factor, Interface | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| Sequential Read | 7000 MB/s | 7300 MB/s | | |
| Sequential Write | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| Random Read IOPS | 400K | 800K | 1M | |
| Random Write IOPS | 700K | 1M | | |
| Pseudo-SLC Caching | Supported | | | |
| TCG Opal Encryption | No | | | |
| Warranty | 5 years (with 3 year DRS) | | | |
| Write Endurance | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| MSRP (non-heatsink) | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21

75.    The Accused Products comprise a first processor component configured to perform at least one lower level memory operation on the at least one memory location, the at least one lower level memory operation comprising at least one of a read operation, a write operation, an erase operation, or a refresh operation. For example, upon information and belief, the FireCuda 530 comprises a Phison PS5018-E18 controller (processor). For example, the Phison PS5018-E18 is configured to perform read and write operations.

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| Controller | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| NAND Flash | 176L 3D TLC NAND (Micron B47R) | | | |
| Form-Factor, Interface | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| Sequential Read | 7000 MB/s | 7300 MB/s | | |
| Sequential Write | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| Random Read IOPS | 400K | 800K | 1M | |
| Random Write IOPS | 700K | 1M | | |
| Pseudo-SLC Caching | Supported | | | |
| TCG Opal Encryption | No | | | |
| Warranty | 5 years (with 3 year DRS) | | | |
| Write Endurance | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| MSRP (non-heatsink) | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21



Source: https://www.phison.com/en/ps5018-e18



Source: https://www.phison.com/en/ps5018-e18

76.    The Accused Products comprise a second processor component configured to be local to the at least one memory component and further configured to determine whether at least

one higher level memory operation is to be performed on the at least one other memory location and, in response to determining the at least one higher level memory operation is to be performed, perform the at least one higher level memory operation on the at least one other memory location independent of the first processor component and without using any processing resources from the first processor component, the at least one higher level memory operation comprising at least one of data compaction, error code correction, or wear leveling, wherein the first processor component and the second processor component are further respectively configured to operate independent of each other for at least a portion of time including during respective performance of the at least one lower level memory operation and the at least one higher level memory operation, which are performed simultaneously, and wherein the second processor component is further configured to obtain code relating to the at least one higher level memory operation from a storage component and execute the code to facilitate performance of the at least one higher level memory operation. For example, the Phison PS5018-E18 has multiple processors, as it comprises a "Tripe Arm Cortex R5 CPU" and "Dual CoxProcessor." For example, upon information and belief, the FireCuda 530 has its controller (the Phison PS5018-E18) configured, at least a portion of the time, such that one processor may perform both the higher level operation (wear leveling) and another processor may perform the lower level operation (read/write) both simultaneously and independently of each other.

### 7.1.2    Wear Leveling

NAND flash devices can only undergo a limited number of program/erase cycles, and in most cases, the flash media are not used evenly. If some areas get updated more frequently than others, the lifetime of the device would be reduced significantly. Thus, Wear Leveling is applied to extend the lifespan of NAND Flash by evenly distributing write and erase cycles across the media.

Seagate provides advanced Wear Leveling algorithm, which can efficiently spread out the flash usage through the whole flash media area. Moreover, by implementing both dynamic and static Wear Leveling algorithms, the life expectancy of the NAND flash is greatly improved.

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-

content/internal-products/ssd/firecuda-530-
ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

77.    Defendants have and continue to indirectly infringe one or more claims of the '611

Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement

by others, such as Defendants' customers and end-users, in this District and elsewhere in the

United States. For example, Defendants' customers and end-users directly infringe, either literally

or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing

into the United States products that include infringing technology, such as the Accused Products.

Defendants induce this direct infringement through their affirmative acts of manufacturing, selling,

distributing, and/or otherwise making available the Accused Products, and providing instructions,

documentation, and other information to customers and end-users suggesting that they use the

Accused Products in an infringing manner, including technical support, marketing, product

manuals, advertisements, and online documentation. Because of Defendants' inducement,

Defendants' customers and end-users use the Accused Products in a way Defendants intend, and

they directly infringe the '611 Patent. Defendants perform these affirmative acts with the intent to

cause infringing acts by others or, in the alternative, with the belief that there was a high probability

that others, including end-users, infringe the '611 Patent, but while remaining willfully blind to

the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants

use the Accused Products in a manner that directly infringes claim 1 of the '611 Patent.

78.    Defendants have and continue to indirectly infringe one or more claims of the '611

Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such

as customers and end-users, in this District and elsewhere in the United States. Defendants'

affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere

in the United States and causing the Accused Products to be manufactured, used, sold, and offered

for sale contributes to others' use and manufacture of the Accused Products, such that the '611 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '611 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '611 Patent. Defendants perform these affirmative acts with knowledge of the '611 Patent and with intent, or willful blindness, that they cause the direct infringement of the '611 Patent.

79.     Defendants had actual notice they were infringing the '611 Patent as of January 22, 2021.

80.     Defendants are, and have been, on actual notice of the '611 Patent and they knowingly, willfully, and deliberately continue to infringe the '611 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

81.     MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '611 Patent in an amount to be proved at trial.

82.     MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '611 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## <u>COUNT IV</u>
### (Infringement of the '776 Patent)

83.     Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

84.     MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '776 Patent.

85.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the '776 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or

importing into the United States products and/or methods covered by one or more claims of the '776 Patent including, but not limited to, at least the Accused Products.

86.     Defendants have and continue to directly infringe the '776 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '776 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '776 Patent.

87.     For example, Defendants have and continue to directly infringe at least claim 1 of the '776 Patent by making, using, offering to sell, selling, and/or importing into the United States products comprising a system, comprising: an external electronic memory component that comprises a plurality of memory locations and facilitates storage of data in at least a portion of the plurality of memory locations, wherein the external electronic memory component is configured to be external from and communicatively connected to a host component, and to receive a request to perform at least one of a task, a function, or an operation, which is offloaded to the external electronic memory component by the host component; and an optimized controller component configured to be part of the external electronic memory component, wherein, in response to the request, the optimized controller component is configured to perform the at least one of the task, the function, or the operation, and wherein, in performance of the at least one of the task, the function, or the operation, the optimized controller component is configured to access a subset of the data stored in the portion of the plurality of memory locations in the external electronic memory component, perform the at least one of the task, the function, or the operation on the subset of the data to facilitate generation of result data that is based at least in part on the subset of the data, and transmit the result data to a host memory of the host component without transmission of the subset

of the data to the host component and without allowance of access of the subset of the data by the host component.

88.    The Accused Products comprise an external electronic memory component that comprises a plurality of memory locations and facilitates storage of data in at least a portion of the plurality of memory locations, wherein the external electronic memory component is configured to be external from and communicatively connected to a host component, and to receive a request to perform at least one of a task, a function, or an operation, which is offloaded to the external electronic memory component by the host component. For example, the BarraCuda 510 is a solid-state drive and supports TCG Opal. For example, the BarraCuda 510, implementing the TCG Opal standard, has a plurality of memory locations – Logical Block Addresses (LBAs). For example, tasks, functions, or operations may be offloaded to the BarraCuda 510, as shown below.

| Security | ▪ TCG Pyrite supported on standard models<br>▪ AES-256 and TCG Opal 2.0 IEEE1667 supported on SED models |
| --- | --- |

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/barracuda-510-ssd/_shared/pdf/100847099_D.pdf

**2.6.2    TCG Opal Security Mode**

This mode provides services through industry-standard ATA commands, TCG Opal commands addressed to the TCG Admin SP, and TCG Opal commands addressed to the TCG Locking SP. It provides all of the services of the ATA Enhanced Security Mode as well as additional features through TCG Opal commands. Some ATA Security commands are disabled in this mode and their functionality is provided through the TCG Opal commands. To operate in TCG Opal Security Mode, the Drive Owner must invoke the Activate method on the Locking SP from the uninitialized state.

*Id.*



Source (Annotated): https://trustedcomputinggroup.org/wp-content/uploads/TCG_Storage_Architecture_Core_Spec_v2.01_r1.00.pdf

89.     The Accused Products comprise an optimized controller component configured to be part of the external electronic memory component, wherein, in response to the request, the optimized controller component is configured to perform the at least one of the task, the function, or the operation, and wherein, in performance of the at least one of the task, the function, or the operation, the optimized controller component is configured to access a subset of the data stored in the portion of the plurality of memory locations in the external electronic memory component,

perform the at least one of the task, the function, or the operation on the subset of the data to facilitate generation of result data that is based at least in part on the subset of the data, and transmit the result data to a host memory of the host component without transmission of the subset of the data to the host component and without allowance of access of the subset of the data by the host component. For example, upon information and belief, the BarraCuda 510 is configured to perform data reads by first decrypting the encrypted data. For example, upon information and belief, the BarraCuda 510's is configured to access the encryption key for a given LBA range and the decrypted user data is transmitted to the host without allowing access of the encryption key to the host.



Source (Annotated): https://trustedcomputinggroup.org/wp-content/uploads/TCG_Storage_Architecture_Core_Spec_v2.01_r1.00.pdf

90.    Defendants have and continue to indirectly infringe one or more claims of the '776 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement

by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and they directly infringe the '776 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '776 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '776 Patent.

91.    Defendants have and continue to indirectly infringe one or more claims of the '776 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '776 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '776 Patent, are not staple articles or commodities of commerce,

have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '776 Patent. Defendants perform these affirmative acts with knowledge of the '776 Patent and with intent, or willful blindness, that they cause the direct infringement of the '776 Patent.

92.    Defendants had actual notice they were infringing the '776 Patent as of July 27, 2020.

93.    Defendants are, and have been, on actual notice of the '776 Patent and they knowingly, willfully, and deliberately continue to infringe the '776 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

94.    MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '776 Patent in an amount to be proved at trial.

95.    MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '776 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## COUNT V
### (Infringement of the '049 Patent)

96.    Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

97.    MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '049 Patent.

98.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the '049 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '049 Patent including, but not limited to, at least the Accused Products.

99.    Defendants have and continue to directly infringe the '049 Patent, either literally or

under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '049 Patent. Upon information and belief, these products include the Accused Products that practice the methods and systems covered by the '049 Patent.

100.    For example, Defendants have and continue to directly infringe at least claim 1 of the '049 Patent by making, using, offering to sell, selling, and/or importing into the United States products that practice a method for relocating data stored in a memory component comprising: first performing, using a first processor within the memory component, the at least one lower level memory operation on the memory component wherein the memory component comprises a plurality of memory locations, the plurality of memory locations comprising at least one memory location and at least one different memory location, wherein the at least one lower level memory operation comprises performing, on the at least one memory location, the at least one of a read, a write, an erase, or a refresh operation and wherein the first processor performs the at least one lower level memory operation using a first bus; determining, using a second processor within the memory component, the second processor being independent from the first processor and, whether to relocate data in the at least one memory location to the at least one different memory location based at least in part on a predetermined relocation criterion; and second performing, using the second processor and based at least in part on the determining, the second performing comprising moving the data from the at least one memory location of the memory component to the at least one different memory location of the memory component, wherein the at least one different memory location is determined to be less worn than the at least one memory location; wherein the determining and the second performing are performed by the second processor using the first bus;

and wherein the first performing is performed at least partially concurrently with, but independently from, the at least one of the determining whether to relocate, cache, compact, or wear level the data, and wherein performing the at least one lower level memory operation utilizes the first processor without utilizing the second processor.

101.    The Accused Products practice a method for relocating data stored in a memory component. For example, FireCuda 530 practices a method for relocating data stored in a memory component.

102.    The Accused Products practice a method for first performing, using a first processor within the memory component, the at least one lower level memory operation on the memory component wherein the memory component comprises a plurality of memory locations, the plurality of memory locations comprising at least one memory location and at least one different memory location, wherein the at least one lower level memory operation comprises performing, on the at least one memory location, the at least one of a read, a write, an erase, or a refresh operation and wherein the first processor performs the at least one lower level memory operation using a first bus. For example, the FireCuda 530 has a processor (Phison PS5018-E18). For example, the Phison PS5018-E18 is configured to perform read and write operations.

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| **Controller** | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| **NAND Flash** | 176L 3D TLC NAND (Micron B47R) | | | |
| **Form-Factor, Interface** | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| **Sequential Read** | 7000 MB/s | 7300 MB/s | | |
| **Sequential Write** | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| **Random Read IOPS** | 400K | 800K | 1M | |
| **Random Write IOPS** | 700K | 1M | | |
| **Pseudo-SLC Caching** | Supported | | | |
| **TCG Opal Encryption** | No | | | |
| **Warranty** | 5 years (with 3 year DRS) | | | |
| **Write Endurance** | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| **MSRP (non-heatsink)** | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21



Source: https://www.phison.com/en/ps5018-e18



Source: https://www.phison.com/en/ps5018-e18

103.    The Accused Products practice a method for determining, using a second processor within the memory component, the second processor being independent from the first processor and, whether to relocate data in the at least one memory location to the at least one different memory location based at least in part on a predetermined relocation criterion. For example, the FireCuda 530's processor is a tiple core (i.e., multiple processors). For example, upon information and belief, a second processor is  configured to relocate data in at least one memory location to a different memory location based at least in part on a predetermined relocation criterion independent of the first processor.



Source: https://www.phison.com/en/ps018-e18

104.    The Accused Products practice a method for second performing, using the second processor and based at least in part on the determining, the second performing comprising moving the data from the at least one memory location of the memory component to the at least one different memory location of the memory component, wherein the at least one different memory location is determined to be less worn than the at least one memory location. For example, the FireCuda 530 is configured to perform wear leveling (moving data from a page of block to a less worn page or block).

### 7.1.2    Wear Leveling

NAND flash devices can only undergo a limited number of program/erase cycles, and in most cases, the flash media are not used evenly. If some areas get updated more frequently than others, the lifetime of the device would be reduced significantly. Thus, Wear Leveling is applied to extend the lifespan of NAND Flash by evenly distributing write and erase cycles across the media.

Seagate provides advanced Wear Leveling algorithm, which can efficiently spread out the flash usage through the whole flash media area. Moreover, by implementing both dynamic and static Wear Leveling algorithms, the life expectancy of the NAND flash is greatly improved.

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

105.    The Accused Products practice a method wherein the determining and the second performing are performed by the second processor using the first bus. For example, upon information and belief, both processors utilize the same bus.

106.    The Accused Products practice a method wherein the first performing is performed at least partially concurrently with, but independently from, the at least one of the determining whether to relocate, cache, compact, or wear level the data, and wherein performing the at least one lower level memory operation utilizes the first processor without utilizing the second processor. For example, upon information and belief, the wear leveling performed by the second processor is performed partially concurrently (and independently) from the read/write operation. For example, upon information and belief, the FireCuda 530 performs the read/write without utilizing the second processor.

107.    Defendants have and continue to indirectly infringe one or more claims of the '049 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and

they directly infringe the '049 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '049 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '049 Patent.

108.    Defendants have and continue to indirectly infringe one or more claims of the '049 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '049 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '049 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '049 Patent. Defendants perform these affirmative acts with knowledge of the '049 Patent and with intent, or willful blindness, that they cause the direct infringement of the '049 Patent.

109.    Defendants had actual notice they were infringing the '049 Patent as of January 22, 2021.

110.    Defendants are, and have been, on actual notice of the '049 Patent and they knowingly, willfully, and deliberately continue to infringe the '049 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

111.    MRL has suffered damages as a result of Defendants' direct and indirect

infringement of the '049 Patent in an amount to be proved at trial.

112.    MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '049 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## COUNT VI
### (Infringement of the '303 Patent)

113.    Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

114.    MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '303 Patent.

115.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the '303 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '303 Patent including, but not limited to, at least the Accused Products.

116.    Defendants have and continue to directly infringe the '303 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '303 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '303 Patent.

117.    For example, Defendants have and continue to directly infringe at least claim 1 of the '303 Patent by making, using, offering to sell, selling, and/or importing into the United States products comprising a system, comprising: a memory that stores secure data and computer executable components; and a processor that executes the following computer executable components stored within the memory: an optimized controller component configured to: in response to receiving a request, authenticate a host device associated with the memory and

determine, based on the authentication of the host device, an availability of a task; in response to determining the task is available, perform the task on the secure data to generate result data, wherein the memory stores the secure data, wherein the secure data is a subset of data other than a second subset of data that is used to access the secure data in the memory and other than a third subset of data that is used to decrypt the secure data, and wherein the host device is not permitted access to the secure data; and transmits the result data to the host device without transmission of the secure data to the host device.

118.    The Accused Products comprise a memory that stores secure data and computer executable components. For example, the BarraCuda 510 securely stores data, as the BarraCuda 51 supports TCG Opal.

| Security | ■ TCG Pyrite supported on standard models |
| | ■ AES-256 and TCG Opal 2.0 IEEE1667 supported on SED models |

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/barracuda-510-ssd/_shared/pdf/100847099_D.pdf

**2.6.2    TCG Opal Security Mode**
This mode provides services through industry-standard ATA commands, TCG Opal commands addressed to the TCG Admin SP, and TCG Opal commands addressed to the TCG Locking SP. It provides all of the services of the ATA Enhanced Security Mode as well as additional features through TCG Opal commands. Some ATA Security commands are disabled in this mode and their functionality is provided through the TCG Opal commands. To operate in TCG Opal Security Mode, the Drive Owner must invoke the Activate method on the Locking SP from the uninitialized state.

119.    The Accused Products comprise a processor that executes the below computer executable components stored within the memory, and the Accused Products comprise processors that execute an optimized controller component configured to do the below. For example, the BarraCuda 510 has a Phison PS5012-E12.

| Seagate BarraCuda 510 & FireCuda 510 SSD Specifications | | | | |
|---|---|---|---|---|
| **Model** | **BarraCuda 510** | | **FireCuda 510** | |
| **Capacity** | 256 GB | 512 GB | 1000 GB | 2000 GB |
| **Form Factor** | single-sided M.2 2280 | | double-sided M.2 2280 | |
| **Controller** | Phison PS5012-E12 | | | |
| **NAND Flash** | Toshiba 64L 3D TLC | | | |

Source: https://www.anandtech.com/print/13795/seagate-at-ces-2019-barracuda-510-and-firecuda-510-m2-nvme

120.    The Accused Products comprise an optimized controller component configured to in response to receiving a request, authenticate a host device associated with the memory and determine, based on the authentication of the host device, an availability of a task. For example, the BarraCuda 510 utilizes a process to authenticate a host device, as evidenced by the below.



## 2.2  Architecture Components

*Begin Informative Content*

The architecture is illustrated in Figure 1, which shows a single Multicomponent Trusted Platform (MCTP) with one Trusted Peripheral (TPer).  An MCTP supports 1 or more TPers.  Figure 1 shows just one example.  Other possibilities include multiple hosts communicating with a single Storage Device/TPer, a single host communicating with multiple Storage Devices/TPers, etc.

*End Informative Content*

**Figure 1    Diagram of the Core Architecture**

Source: https://trustedcomputinggroup.org/wp-content/uploads/TCG_Storage_Architecture_Core_Spec_v2.01_r1.00.pdf

## 2.5  Authentication

An Opal SSC compliant SD SHALL support password authorities and authentication.

Source: https://trustedcomputinggroup.org/wp-content/uploads/TCG_Storage-Opal_SSC_v2.01_rev1.00.pdf

121.    The Accused Products comprise an optimized controller component configured to

in response to determining the task is available, perform the task on the secure data to generate

result data, wherein the memory stores the secure data, wherein the secure data is a subset of data

other than a second subset of data that is used to access the secure data in the memory and other than a third subset of data that is used to decrypt the secure data, and wherein the host device is not permitted access to the secure data. For example, the BarraCuda 510 stores encrypted data. For example, upon information and belief, the BarraCuda 510 is configured to access the encryption key for a given LBA range. For example, upon information and belief, the BarraCuda 510 is configured such that the decrypted user data is transmitted to the host without allowing access of the encryption key to the host.

122.    The Accused Products comprise an optimized controller component configured to transmit the result data to the host device without transmission of the secure data to the host device. For example, the BarraCuda 510 transmits the result data to the host without the transmission of the encryption key, as shown below.



Source (Annotated): https://trustedcomputinggroup.org/wp-content/uploads/TCG_Storage_Architecture_Core_Spec_v2.01_r1.00.pdf

123.    Defendants have and continue to indirectly infringe one or more claims of the '303 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and they directly infringe the '303 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '303 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '303 Patent.

124.    Defendants have and continue to indirectly infringe one or more claims of the '303 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '303

Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '303 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be specially made or adapted for use in the infringement of the '303 Patent. Defendants perform these affirmative acts with knowledge of the '303 Patent and with intent, or willful blindness, that they cause the direct infringement of the '303 Patent.

125.    Defendants had actual notice they were infringing the '303 Patent as of July 27, 2020.

126.    Defendants are, and have been, on actual notice of the '303 Patent and they knowingly, willfully, and deliberately continue to infringe the '303 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

127.    MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '303 Patent in an amount to be proved at trial.

128.    MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '303 Patent, for which there is no adequate remedy at law, unless Defendant' infringement is enjoined by this Court.

## COUNT VII
### (Infringement of the '383 patent)

129.    Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

130.    MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '383 Patent.

131.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the '383 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the

'383 Patent including, but not limited to, at least the Accused Products.

132. Defendants have and continue to directly infringe the '383 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '383 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '383 Patent.

133. For example, Defendants have and continue to directly infringe at least claim 1 of the '383 Patent by making, using, offering to sell, selling, and/or importing into the United States products comprising a system, comprising: at least one flash memory component configured to include a flash memory array; a first processor component configured to perform at least one of a read operation and a write operation on at least one memory location in the flash memory array; and a second processor component configured to perform at least one wear leveling operation without using any processing resources from the first processor component, wherein the first processor component and the second processor component are further respectively configured to operate independent of each other for at least a portion of time including during respective performance of the at least one of a read operation and a write operation and the at least one wear leveling operation, and wherein the first processor component performs the at least one of a read operation and a write operation on a first bus and the second processor component performs the at least one wear leveling operation on the first bus.

134. The Accused Products comprise at least one flash memory component configured to include a flash memory array. For example, the FireCuda 530 contains NAND flash memory, which on information and belief, is configured to include a flash memory array.



Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

135.    The Accused Products comprise a first processor component configured to perform at least one of a read operation and a write operation on at least one memory location in the flash memory array. For example, upon information and belief, the FireCuda 530 contains a Phison PS5018-E18, which contains a processor, which is configured to perform at least a read or write operation.

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| Controller | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| NAND Flash | 176L 3D TLC NAND (Micron B47R) | | | |
| Form-Factor, Interface | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| Sequential Read | 7000 MB/s | 7300 MB/s | | |
| Sequential Write | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| Random Read IOPS | 400K | 800K | 1M | |
| Random Write IOPS | 700K | 1M | | |
| Pseudo-SLC Caching | Supported | | | |
| TCG Opal Encryption | No | | | |
| Warranty | 5 years (with 3 year DRS) | | | |
| Write Endurance | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| MSRP (non-heatsink) | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21



Source: https://www.phison.com/en/ps5018-e18

136.    The Accused Products comprise a second processor component configured to perform at least one wear leveling operation without using any processing resources from the first processor component. For example, the FireCuda 530 contains a Phison PS5018-E18 which is a "tiple CPU," (i.e., a multi-processor). For example, upon information and belief, the second processor is configured to perform wear leveling without using any resources of the first processor component.



Source: https://www.phison.com/en/ps5018-e18

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf


137.    The Accused Products comprise a first processor wherein the first processor component and the second processor component are further respectively configured to operate independent of each other for at least a portion of time including during respective performance of the at least one of a read operation and a write operation and the at least one wear leveling operation. For example, upon information and belief, the two processors of the FireCuda 530 are configured such that they operate independently of each other for at least a portion of time including during respective performance of at least one of a read operation and a write operation and at least onewear leveling operation.

138.   The Accused Products comprise a first processor wherein the first processor component performs at least one of a read operation and a write operation on a first bus and the second processor component performs at least onewear leveling operation on the first bus. For example,

139.   Defendants have and continue to indirectly infringe one or more claims of the '383 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and they directly infringe the '383 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '383 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '383 Patent.

140.   Defendants have and continue to indirectly infringe one or more claims of the '383 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such

as customers and end-users, in this District and elsewhere in the United States. Defendants'
affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere
in the United States and causing the Accused Products to be manufactured, used, sold, and offered
for sale contributes to others' use and manufacture of the Accused Products, such that the '383
Patent is directly infringed by others. The accused components within the Accused Products are
material to the invention of the '383 Patent, are not staple articles or commodities of commerce,
have no substantial non-infringing uses, and are known by Defendants to be especially made or
adapted for use in the infringement of the '383 Patent. Defendants perform these affirmative acts
with knowledge of the '383 Patent and with intent, or willful blindness, that they cause the direct
infringement of the '383 Patent.

141.    On information and belief, Defendants were aware of the '383 Patent and their
infringement thereof, as it is in the same patent family as the '049, '041, and '611 Patents.  On
information and belief, Defendants monitored this patent family (or were willfully blind to the
existence of this patent family) after receiving the January 22, 2021 Letter, and located or should
have the '383 Patent. On information and belief, Defendants knowingly, willfully, and deliberately
continue to infringe the '383 Patent. As such, MRL is entitled to enhanced damages pursuant to
35 U.S.C. § 284.

142.    MRL has suffered damages as a result of Defendants' direct and indirect
infringement of the '383 Patent in an amount to be proved at trial.

143.    MRL has suffered, and will continue to suffer, irreparable harm as a result of
Defendants' infringement of the '383 Patent, for which there is no adequate remedy at law, unless
Defendant' infringement is enjoined by this Court.

## COUNT VIII
### (Infringement of the '847 Patent)

144.    Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

145.    MRL has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '847 Patent.

146.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the '847 Patent by making, using, selling, offering for sale, distributing, exporting from, and/or importing into the United States products and/or methods covered by one or more claims of the '847 Patent including, but not limited to, at least the Accused Products.

147.    Defendants have and continue to directly infringe the '847 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '847 Patent. Upon information and belief, the Accused Products practice the methods and systems covered by the '847 Patent.

148.    For example, Defendants have and continue to directly infringe at least claim 1 of the '847 Patent by making, using, offering to sell, selling, and/or importing into the United States products comprising a system, comprising: at least one flash memory component configured to include a flash memory array; a first processor component configured to perform at least one of a read operation and a write operation on at least one memory location in the flash memory array; and a second processor component configured to perform at least one data relocation operation without using any processing resources from the first processor component, wherein the first processor component and the second processor component are further respectively configured to operate independently of each other during respective performance of at least one of a read operation and a write operation and at least one data relocation operation, and wherein the first

processor component performs at least one of a read operation and a write operation via a first bus and the second processor component performs at least one data relocation operation via the first bus.

149.     The Accused Products comprise at least one flash memory component configured to include a flash memory array. For example, the FireCuda 530 contains NAND flash memory, which on information and belief, is configured to include a flash memory array.



Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

150.     The Accused Products comprise a first processor component configured to perform at least one of a read operation and a write operation on at least one memory location in the flash memory array. For example, upon information and belief, the FireCuda 530 contains a Phison PS5018-E18, which contains a processor, which is configured to perform at least a read or write operation.

| Seagate FireCuda 530 SSD Specifications | | | | |
|---|---|---|---|---|
| **Capacity** | **500 GB** | **1 TB** | **2 TB** | **4 TB** |
| Controller | Phison PS5018-E18 (PCIe 4.0 x4) | | | |
| NAND Flash | 176L 3D TLC NAND (Micron B47R) | | | |
| Form-Factor, Interface | Single-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | | Double-Sided M.2-2280, PCIe 4.0 x4, NVMe 1.4 | |
| Sequential Read | 7000 MB/s | | 7300 MB/s | |
| Sequential Write | 3000 MB/s | 6000 MB/s | 6900 MB/s | |
| Random Read IOPS | 400K | 800K | 1M | |
| Random Write IOPS | 700K | 1M | | |
| Pseudo-SLC Caching | Supported | | | |
| TCG Opal Encryption | No | | | |
| Warranty | 5 years (with 3 year DRS) | | | |
| Write Endurance | 640 TB 0.7 DWPD | 1275 TB 0.7 DWPD | 2550 TB 0.7 DWPD | 5100 TB 0.7 DWPD |
| MSRP (non-heatsink) | $140 (25¢/GB) | $240 (25¢/GB) | $490 (21¢/GB) | $950 (21¢/GB) |

Source: https://www.anandtech.com/show/16786/seagate-announces-firecuda-530-pcie-40-ssd-at-sg21



Source: https://www.phison.com/en/ps5018-e18

57

151.    The Accused Products comprise a second processor component configured to perform at least one data relocation operation without using any processing resources from the first processor component. For example, For example, the FireCuda 530 contains a Phison PS5018-E18 which is a "tiple CPU," (i.e., a multi-processor). For example, upon information and belief, the second processor is configured to perform wear leveling.



Source: https://www.phison.com/en/ps5018-e18

Source: https://www.seagate.com/content/dam/seagate/migrated-assets/www-content/support-content/internal-products/ssd/firecuda-530-ssd/_shared/files/firecuda_530_product_manual_200432500_D.pdf

152.    The Accused Products comprise a first processor wherein the first processor component and the second processor component are further respectively configured to operate independently of each other during respective performance of at least one of a read operation and a write operation and at least one data relocation operation. For example, upon information and

belief, the first and second processors are configured in the FireCuda 530 such that they operate independently of each other during respective performance of at least one of a read operation and a write operation and at least one data relocation operation.

153.    The Accused Products comprise a first processor wherein the first processor component performs at least one of a read operation and a write operation via a first bus and the second processor component performs at least one data relocation operation via the first bus. For example, upon information and belief, the FireCuda 530 is configured such that the first processor is configured to perform a read operation and a write operation via a first bus and the second processor is configured to perform at least one data relocation operation via the first bus

154.    Defendants have and continue to indirectly infringe one or more claims of the '847 Patent, as provided by 35 U.S.C. § 271(b), by knowingly and intentionally inducing infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Accused Products. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Defendants' inducement, Defendants' customers and end-users use the Accused Products in a way Defendants intend, and they directly infringe the '847 Patent. Defendants perform these affirmative acts with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability

that others, including end-users, infringe the '847 Patent, but while remaining willfully blind to the infringement. Through demonstrations, testing, repairs, and instructional guidance, Defendants use the Accused Products in a manner that directly infringes claim 1 of the '847 Patent.

155.    Defendants have and continue to indirectly infringe one or more claims of the '847 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '847 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '847 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '847 Patent. Defendants perform these affirmative acts with knowledge of the '847 Patent and with intent, or willful blindness, that they cause the direct infringement of the '847 Patent.

156.    On information and belief, Defendants were aware of the '383 Patent and their infringement thereof, as it is in the same patent family as the '049, '041, and '611 Patents.  On information and belief, Defendants monitored this patent family (or were willfully blind to the existence of this patent family) after receiving the January 22, 2021 Letter, and located or should have the '383 Patent. On information and belief, Defendants knowingly, willfully, and deliberately continue to infringe the '383 Patent. As such, MRL is entitled to enhanced damages pursuant to 35 U.S.C. § 284.

157.    MRL has suffered damages as a result of Defendants' direct and indirect infringement of the '847 Patent in an amount to be proved at trial.

158.    MRL has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '847 Patent, for which there is no adequate remedy at law, unless Defendant' infringement is enjoined by this Court.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, MRL prays for relief against Defendants, as follows:

a.    Entry of judgment declaring that Defendants directly and/or indirectly infringe(d) one or more claims of each of the Patents-in-Suit;

b.    Entry of judgment declaring that Defendants' infringement of the Patents-in-Suit is willful;

c.    An order awarding damages sufficient to compensate Plaintiff for Defendants' infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, including supplemental damages post-verdict, together with pre-judgment and post-judgment interest and costs;

d.    Enhanced damages pursuant to 35 U.S.C. § 284;

e.    Entry of judgment declaring that this case is exceptional and awarding Plaintiff its costs and reasonable attorney fees pursuant to 35 U.S.C. § 285;

f.    An accounting for acts of infringement;

g.    Award such other equitable relief which may be requested and to which the Plaintiff is entitled; and

h.    Award such other and further relief as the Court deems just and proper.

Dated: June 2, 2025                              Respectfully submitted,

*/s/ Alfred R. Fabricant*
Alfred R. Fabricant
NY Bar No. 2219392
Email: ffabricant@fabricantllp.com
Joseph M. Mercadante
NY Bar No. 4784930
Email: jmercadante@fabricantllp.com
Enrique W. Iturralde
NY Bar No. 5526280
Email: eiturralde@fabricantllp.com
**FABRICANT LLP**
411 Theodore Fremd Avenue
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

***ATTORNEYS FOR PLAINTIFF***
***MR LICENSING LLC***